DANIEL G. BOGDEN
United States Attorney
KATHRYN NEWMAN
Assistant United States Attorney
333 Las Vegas Blvd., Suite 5000
Las Vegas, Nevada 89101
Telephone: (702) 388-6336
TODD S. MIKOLOP
Trial Attorney
Environmental Crimes Section
601 D St., NW
Washington, DC 20004
Telephone: (202) 305-0381

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA
## -oOo-

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>vs.<br><br>**LUMSDEN W. QUAN and EDWARD N. LEVINE,**<br><br>          Defendants. | **Case No.:** 2:14-mj-00200-VCF<br><br>**CRIMINAL COMPLAINT**<br><br>VIOLATIONS:<br><br>18 U.S.C. § 371  – Conspiracy<br>16 U.S.C. § 3372 (a)(1) and 3373 (d)(B) –<br>Lacey Act Trafficking<br>16 U.S.C. § 1538 (a)(1)(E), (F) and 1540 (b)(1)<br>– Endangered Species Act |

BEFORE the United States Magistrate Judge, Las Vegas, Nevada, the undersigned

complainant, being duly sworn, deposes and states:

### COUNT ONE
(Conspiracy)

1.     On or about and between January 20, 2014, and March 19, 2014, in the State and

Federal District of Nevada and elsewhere,

**LUMSDEN W. QUAN and EDWARD N. LEVINE,**

defendants herein, did knowingly combine, confederate, and agree, together and with others known and unknown, to commit acts in violation of the laws of the United States, namely, to fraudulently and knowingly transport and sell wildlife, namely, Black Rhinoceros horns with a market value in excess of $350, knowing that the Black Rhinoceros horns had been possessed, transported and sold in violation of federal law, namely, the Endangered Species Act, Title 16 United States Code, Sections 1538 (a)(1)(E) and (F), and to fraudulently and knowingly possess, transport, and sell in interstate commerce Black Rhinoceros horns, in violation of the Endangered Species Act, Title 16 United States Code, Sections 1538 (a)(1)(E) and (F).

All in violation of Title 18, United States Code section 371; Title 18 United States Code Section 2.

## COUNT TWO
(Lacey Act Trafficking)

2.     On or about March 19, 2014, in the State and Federal District of Nevada and elsewhere,

**LUMSDEN W. QUAN and EDWARD N. LEVINE,**

defendants herein, did knowingly transport and sell wildlife, namely, two endangered Black Rhinoceros horns with a market value in excess of $350, knowing that the Black Rhinoceros horns had been possessed, transported and sold in violation of federal law, namely, the Endangered Species Act, Title 16 United States Code, Sections 1538 (a)(1)(E) and (F), to wit, an individual known as "D.S." transported in interstate commerce two horns from an endangered Black Rhinoceros from California to Las Vegas, Nevada, where LUMSDEN W. QUAN and EDWARD N. LEVINE sold the two endangered Black Rhinoceros horns to a law enforcement agent acting in an undercover capacity.

All in violation of Title 16, United States Code Sections 3372 (a)(1) and 3373 (d)(1)(B); Title 18 United States Code Section 2.

**COUNT THREE**
(Endangered Species Act)

3.      On or about March 19, 2014, in the State and Federal District of Nevada and elsewhere,

**LUMSDEN W. QUAN and EDWARD N. LEVINE,**

defendants herein, did knowingly deliver, carry, transport, and ship in interstate commerce and sold or offered for sale in interstate commerce, endangered species, namely, two endangered Black Rhinoceros horns.

All in violation of Title 16, United States Code, Sections 1538 (a)(1)(E) and (F); Title 18 United States Code Section 2.

**PROBABLE CAUSE**

Complainant, Vance Jurgens, as a Special Agent with the United States Fish and Wildlife Service ("USFWS"), states the following as and for probable cause:

4.      I am a Special Agent ("SA") of the USFWS, Office of Law Enforcement, which is part of the United States Department of Interior.  I have been employed as a Special Agent since 2001.  Prior to my work as an agent, I was employed as a Conservation Officer with the South Dakota Game, Fish and Parks Department.  I am presently assigned to the Special Investigations office in Denver, Colorado that specializes in long term, complex and undercover investigations.  I have been involved in investigations into both State and Federal violations regarding the unlawful importation of wildlife into the United States.  My duties include the enforcement of regulations of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), an international treaty to which the United States is a signatory, as well as enforcement of the Lacey Act, 16 U.S.C. § 3371, et seq., and the Endangered Species Act, 16 U.S.C. § 1531, et seq.

5.      I received specialized training during the Criminal Investigators Training Program and Special Agent Basic School at the Federal Law Enforcement Training Center.  While at the

USFWS, I have participated in various investigations, including the use of confidential sources and undercover officers, electronic and physical surveillance, the execution of search and arrest warrants, and investigative interviews.  Through my training and experience, as well as consultation with other experienced investigators, I have become familiar with the methods of those engaged in illegal wildlife trafficking, smuggling and money laundering and their use of computers, telephones, cell phones and other devices to conduct their criminal enterprises.  I am also familiar with their techniques to conceal assets and proceeds from their illegal activities.

6.      The information included in this affidavit is based upon my own investigation and information provided to me by other Law Enforcement personnel, including information I believe to be reliable from the following sources: (1) oral reports, written reports (including those that have future transcribed statements from recorded conversations), and/or affidavits prepared by one or more federal agents; (2) physical surveillance that other federal agents have conducted; (3) information provided by confidential sources; (4) telephone records; (5) search warrants; (6) information obtained from Special Agents working undercover; and (7) records obtained from various sources.

7.      Since this affidavit is intended only to establish probable cause for the issuance of a criminal complaint, it does not contain all information developed during the course of the investigation.

## BACKGROUND AND STATUTORY OVERVIEW

8.      I am a member of a team of agents working on an investigation known as "OPERATION CRASH."  A "crash" is the term for a herd of rhinoceros.  In sum and substance, OPERATION CRASH is designed to detect, investigate, prosecute and deter those engaged in the illegal killing of rhinoceros and the unlawful trafficking of rhinoceros horns.

9.      The Lacey Act makes it unlawful for a person to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce any wildlife, taken, possessed,

transported, or sold in violation of foreign law, United States law or treaty of the United States. 16 U.S.C. §§ 3372(a)(1); 3372(a)(2)(A). The Lacey Act also makes it unlawful for a person to make or submit any false record, account or label for, or any false identification of, any wildlife which has been, or is intended to be, imported, exported, transported, sold, purchased or received from any foreign country or transported in interstate or foreign commerce. 16 U.S.C. § 3372(d)(1).

10. The Endangered Species Act ("ESA") (16 U.S.C. §§ 1531 et seq.) was enacted to provide a program for the conservation of endangered species and threatened species. The ESA makes it a misdemeanor crime for any person subject to the jurisdiction of the United States, to knowingly deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any endangered species. 16 U.S.C. §§ 1538(a)(1)(E), 1540(b). In addition, under 16 U.S.C. §§ 1538(a)(1)(F), 1540(b) it is a criminal violation for any person to offer to sell, or sell, an endangered species in interstate commerce. Under the ESA the term "endangered species" includes any species, or part thereof, included on the Endangered Species List, which is set forth in the Code of Federal Regulations. See also 16 U.S.C. §§ 1532(8) (defining the term "fish or wildlife" as including any member of the animal kingdom, including the dead body or parts thereof), 1532(16) (defining the term "species" as including any subspecies of fish or wildlife), 1532(6) (defining the term "endangered species" as any species that is in danger of extinction throughout all or a significant portion of its range) and 1533 (authorizing the Secretary of the Interior to designate a species as an endangered species based on certain factors). The species *Diceros bicornis*, which is commonly known as the Black Rhinoceros was added to the Endangered Species List on July 1, 1975. See 50 C.F.R. ¶ 17.11 (setting forth species included on the Endangered Species List).

11. Rhinoceros horn is a highly valued and sought after commodity despite the fact that trade in it is regulated under the Convention on International Trade in Endangered Species ("CITES") since 1976. CITES is a treaty providing protection to fish, wildlife, and plants that are or

5

may become imperiled due to the demands of international markets.  CITES has been signed by over 175 countries around the world, including the United States.  Within the United States, CITES is implemented under the authority of the Endangered Species Act and the regulations promulgated thereunder.  16 U.S.C. § 1538(c); 50 C.F.R. ¶¶ 14 and 23.  According to a search of USFWS databases by law enforcement the USFWS has not issued any CITES export certificates to any of the defendants referenced above.

12.     I have advanced knowledge of rhinoceros and the illegal trade of rhinoceros.  Rhinoceros are an herbivore species of prehistoric origin characterized by their enormous size, leathery skin and horns.  Rhinoceros are "living fossils" and one of the largest remaining mega-fauna on earth.  All species of rhinoceros are protected under U.S. and international law.  All Black rhinoceros species are endangered.  The horns are actually composed of keratin, the same type of protein that makes up hair and fingernails.  Both African species and the Sumatran Rhinoceros have two horns, while the Indian and Javan Rhinoceros have a single horn.

13.     I am informed that rhinoceros horn is a highly valued and sought after commodity despite the fact that international trade has been largely banned since 1976.  The demand for rhinoceros horn, which is used by some cultures for ornamental carvings, good luck charms, or alleged Asian medicinal purposes, has resulted in a thriving black market.  Consequently, humans, as the only known predator of rhinoceros, are causing most species of rhinoceros to be extinct or on the brink of extinction.

14.     I am informed that the black market price for rhinoceros horn is as high as $25,000-29,000 per pound.  Rhinoceros horn is believed in some Asian cultures to have health benefits.  In Vietnam, in particular, there have been recent claims by some that rhinoceros horn can cure cancer.  Rhinoceros horn also is believed to bring good luck and is highly sought after as ornaments.  Based upon my experience, training and research, and from what I have learned in this investigation, I

1    understand that China and Vietnam among the largest known markets for rhinoceros horn and that

2    there is no significant end market in the United States.

3    ## THE INVESTIGATION

4    15.    This portion of OPERATION CRASH concerns LUMSDEN "LU" W. QUAN,

5    MICHAEL STARK (a.k.a. EDWARD N. LEVINE) and those with whom they are engaged in the

6    illegal trade of rhinoceros horns, including but not limited to, at least two other individuals.

7    Information obtained in this investigation indicates that QUAN has been involved in selling

     rhinoceros horns since at least 2010.

8
     ### Prior Undercover Sale of Black Rhinoceros Horns by CS1

9    16.    As part of OPERATION CRASH, I am aware of information provided by a

10   Confidential Source ("CS1"). CS1 has identified QUAN as a person who CS1 knew to purchase

11   and/or sell rhinoceros horns in the 2010 time period. I am informed of the following information

12   pertaining to CS1. CS1 is a defendant in the District of Maine for his role in a conspiracy to

13   smuggle wildlife parts from Canada into the United States and a conspiracy to launder the money

14   used in the smuggling transactions. CS1 was indicted on felony charges and faces incarceration in

15   connection with those charges. CS1 is represented by criminal defense counsel. CS1 has been made

16   no promises by the government in exchange for CS1's cooperation other than that if he pleads guilty,

17   and his cooperation provides substantial assistance in a prosecution, CS1 may be considered for a

18   reduction of any sentence pursuant to section 5K1.1 of the Federal Sentencing Guidelines. CS1, in

19   fact, pleaded guilty to three felony charges on January 7, 2014. In the course of his cooperation,

20   CS1 admitted to USFWS agents that he had previously purchased White Rhinoceros horns from a

21   Macon, Missouri auction. In the course of his cooperation, CS1 made consensually monitored

22   phone calls and made an undercover sale of rhinoceros horns to a previous subject in OPERATION

23   CRASH, Felix Kha. These calls and recorded sale have corroborated CS1's allegation that Felix

     Kha was involved in the purchase of rhinoceros horns. CS1's information concerning Kha has been

corroborated by other confidential sources, evidence obtained pursuant to search warrants, toll

records, bank records, physical surveillance, through controlled sale of rhinoceros horns, and

consensually-recorded conversations and phone calls that CS1 have had with Felix Kha.[1]

### CS1 Contacts USFWS With Information About Rhinoceros Horn

17.     On January 20, 2014, CS1 received an email from "L. Quan" using the e-mail address

mr4slump@yahoo.com.  The e-mail stated, "this is Lu in San Francisco ... I got the giraffe from

you."  CS1 knew "L. Quan" to be Lu Quan, whom CS1 had, in fact, previously sold a giraffe

shoulder mount to and also facilitated a sale of Black Rhicoeros horns between Felix Kha and

QUAN.  QUAN indicated in the e-mail to CS1 that he had met an elderly man that was moving out

of the country and wanted to sell an antique set of rhinoceros horns.  QUAN also provided CS1 with

his phone number (XXX) XXX-5867.  Further investigation by law enforcement has revealed "Lu

Quan" to be LUMSDEN W. QUAN.

18.     On January 21, 2014, CS1, through defense counsel, passed the information on to the

USFWS.  USFWS agents contacted CS1 consistent with his pre-existing cooperation agreement and

began directing CS1's communications with QUAN.

### Undercover Communications With LUMSDEN W. QUAN

19.     On January 24, 2014, CS1 replied to QUAN's initial e-mail at

mr4slump@yahoo.com to inform QUAN that he had received QUAN's e-mail dated January 20,

2014.

20.     On January 26, 2014, QUAN replied to CS1's e-mail stating, in part:

> ... an elderly man is leaving the country and was thinking about selling a set of
> horns ... I thought I just let you know ... I also tried to call felix but I guess he
> changed his number ... are you or do you know anyone interested? They are in
> California ... can you also forward me felix's new number ... of course you have
> first dibs ...

---

[1] Felix Kha and his father, Jimmy Kha, pleaded guilty in the Central District of California on September 14, 2012, to felony crimes related to their purchase of endangered Black Rhinoceros horns from CS1 and others. *United States v. Felix Kha*, Case No. 2:12-cr-202 (C.D. Cal.).

21.     On January 27, 2014, CS1 replied to QUAN's e-mail stating, in part:

... Yes, I'm interested.  Get me some photo's & measurements of the lengths and cir. Around the base of both horns. If there're lose horns get the weight if you can, if not don't worry about the weight.  Also look to see if there is any damage to the horns. Like cracks or pieces missing and the price...

22.     On January 28, 2014, QUAN replied to CS1's previous e-mail stating, in part:

... the man says the lengths are 20 and 8, circumference 9.5 and 7.5... (I don't know from what spot he is measuring from though)... he says that there are no breaks or repairs... here are two pics... I think that he's asking a lot for the piece though...let me know what you think, thanks [CS1], talk shortly, Lu.

QUAN also sent two photos of rhinoceros horns.  One photo showed an individual measuring one of the horns.  The other photo depicted a set of rhinoceros horns mounted to a wooden plaque.

23.     On January 28, 2014, CS1 replied to QUAN's previous e-mail stating, in part:

Hey Lu, They look real nice. They look like their from a black, which cuts down the # of my people that's willing to buy them.  But they still will bring good $$$. Do you know if their from a black or white? And what's the price?...

24.     On January 29, 2014, CS1 placed a recorded telephone call to QUAN at the number QUAN provided in the first e-mail to CS1.  I am informed by USFWS intelligence analysts that the phone number provided by QUAN is subscribed by AT&T, formerly known as Cingular Wireless Services, and is a cellular telephone number.  During their conversation, QUAN told CS1 that he thinks the man wants too much money for the horn and believed the horns were from a black rhinoceros. CS1 told QUAN that if the horns are from a black rhinoceros that they are endangered. QUAN said he believed the horns were from a black rhinoceros as the owner of the horns has done his research.  QUAN said he wanted $10,000.00 (or $5,000.00 each) for he and his partner, EDWARD LEVINE.  QUAN said the man possessing the rhino horns has a Thai wife and is moving back to Thailand.  QUAN said if the horn does not sell before he departs then the horns will be left in the United States and his partner will sell it for him.  QUAN and CS1 discussed paperwork (permits, documentation) he could get for the black rhino horns being discussed for sale.  CS1 asked

9

QUAN if the older man had documentation for the horns. QUAN said he didn't think so, but would ask.

25.    On January 30, 2014, QUAN replied to CS1's previous e-mail and attached five photographs of a set of rhinoceros horns mounted on a wooden plaque. Three of the photographs showed an individual's hands showing measurements of the horn.

26.    On January 30, 2014, QUAN called CS1 from his cell phone using the speaker phone mode. CS1 recorded the telephone call. CS1 asked QUAN how he knew the horns were from a black rhino. QUAN said the horns were from Africa. QUAN then introduced a second male in the room, LEVINE, who said the owner of the horns knows "his stuff" and the horns were taken from over there "in country." LEVINE said the horns were traded for something of real value. LEVINE said the older man was looking to get $60,000.00 for the rhino horns. CS1 advised LEVINE he was unsure what he was willing to pay as he needed to show the horns to his partner (hereinafter referred to as UC1). CS1 advised LEVINE and QUAN he was aware what the horns were worth in his world. CS1 told LEVINE the sale of the horns were not legal. LEVINE said, "we got the picture, we understand." LEVINE said if he could convince the older man to take $50,000.00 would the deal happen. CS1 stated he would need time to consider and would get back with QUAN. LEVINE said he would try to talk the older man down to $40,000.00, so LEVINE and QUAN could retain $10,000.00 for themselves.

27.    On February 1, 2014, CS1 replied to QUAN's previous e-mail and stated, in part, "...We,ll [sic] take the horns for 50k ..."

28.    On February 2, 2014, CS1 placed a recorded telephone call to QUAN's cell phone. During the call QUAN stated, in part, the following: CS1 advised QUAN the deal could be made in Las Vegas. QUAN indicated he may not be able to make the trip as he suffers from panic attacks. QUAN said he couldn't fly or drive long distances. QUAN asked CS1 to email him the travel details. QUAN said he would contact LEVINE to confirm with him. QUAN said the horns were

currently in Los Angeles. QUAN was on his computer during the telephone call and told CS1 the driving distance between Los Angeles and Las Vegas was four hours. QUAN asked CS1 again to email him the details.

29.    On February 4, 2014, CS1 placed a recorded telephone call to QUAN's cell phone. In the course of the conversation the following, in part, was discussed: QUAN stated that the older man wanted to be present when the deal was made. QUAN said the older man is willing to drive as far as Bakersfield, California. CS1 asked QUAN if $50,000.00 was an agreed upon price. QUAN said the 50k was set. QUAN said the older man lives in San Francisco not Los Angeles. QUAN said he got confused when he originally told CS1 the rhinoceros horns were in Los Angeles.

30.    On February 6, 2014, QUAN sent CS1 an e-mail from "mr4slump@yahoo.com" with the subject "taxidermy" and stated, in part, "... take a look at these pictures, does this one look correct ... coming from an estate ... how much is it worth?" QUAN was referring to three photographs attached to the e-mail of a shoulder mount rhinoceros.

31.    On February 6, 2014, QUAN sent CS1 an e-mail from the e-mail account "mr4slump@yahoo.com" with the subject "libation horn cup" and stated, in part, "does this libation cup look correct?" QUAN sent CS1 four pictures of an alleged rhinoceros horn libation cup.

32.    On February 7, 2014, CS1 replied to QUAN's e-mails regarding the shoulder mount rhinoceros and the libation cup and stated, in part:

> ... It's a black shoulder mount, is it available? Interested. The cup I'm not sure, it looks suspect to me... You should be able to see evidence of hair, usually at the edges, but I'm no expert... I talked to (UC1) and he's changing some dates around to make time to maybe meet you some where to pickup the horns.  Let me know about the mount...

33.    On February 7, 2014, QUAN replied to CS1's previous and stated, in part:

> "... the auction is tomorrow in VA.. It can only be sold to a VA resident... they would have to register online or by phone today... estimate is 10-20k... I'm approved to bid but live in San Francisco... Do you know how we can make a commission on this piece?"

11

The email was in regards to the photos of the rhinoceros shoulder mount sent by QUAN the previous day. The end of the email included the following statement: "This lot will only be sold to Virginia residents. We advise all bidders to research the laws regarding the ownership of certain animals. CITES and USFWS are excellent sources of information regarding the legality of owning foreign or domestic taxidermy."

34.    On February 7, 2014, CS1 made a recorded telephone call to QUAN's cell phone. CS1 and QUAN discussed the rhinoceros shoulder mount that was to be auctioned in Virginia. QUAN said, "they know my address, and if they let me bid that's not my problem." CS1 advised QUAN that CS1's partner (UC1) would be calling next week to make arrangements to meet.

35.    On February 9, 2014, QUAN sent CS1 an email from the e-mail account "mr4slump@yahoo.com." QUAN forwarded information from the rhinoceros shoulder mount auction confirming the mount sold for $55,000.00.

36.    On February 11, 2014, a USFWS Special Agent operating in an undercover capacity (or "UC1" or "Larry"), who was made aware of QUAN's involvement in the rhinoceros trade, contacted QUAN on his cell phone at (XXX) XXX-5867 to discuss the sale of the rhinoceros horns. UC1 recorded the telephone call. QUAN said his partner's friend has the "art work" and cannot drive far. UC1 told QUAN he would be traveling to Las Vegas the week of March 17, 2014. QUAN said the older man sold his car, would have to rent a car and is only willing to drive four or five hours. QUAN said "we're not doing anything wrong here." UC1 advised QUAN the sale of black rhinoceros horn to a nonresident of California was illegal. QUAN said they didn't want to sell it out of state. UC1 told QUAN he lived in the state of Colorado so it didn't matter if the sale occurred in California or not. UC1 told QUAN he and CS1 were willing to pay $50,000.00. QUAN stated that CS1 had previously mentioned a person in Oregon. UC1 advised QUAN if he wanted to do the deal in Oregon it would still be a violation. QUAN told UC1 he sold a set of rhino horns to CS1 four years ago.

37.     On February 12, 2014, QUAN sent an e-mail to CS1 from the e-mail account "mr4slump@yahoo.com" with the subject line "hi Re: Larry."  The e-mail stated, in part:

> ... I connected with Larry yesterday... we're still trying to figure out the time and place... Larry mentioned that his only window is next month in vegas... however, I mentioned to Larry that you have a friend in Oregon... it happens that E is heading up toward Oregon on Thursday... do you think it is a possibility for him to drive the piece of art up to your contact?...

38.     On February 12, 2014, UC1 sent an email to QUAN at the email address listed above. In the email, UC1 told QUAN if he and LEVINE are willing to meet the week of March 17, 2014, UC1 is willing to increase the price paid for the rhino horns.

39.     On February 12, 2014, UC1 placed a recorded telephone call to QUAN's cell phone. The following details were discussed between UC1 and QUAN: UC1 advised QUAN that UC1 was willing to offer another $5,000.00 to the price of the rhinoceros horns. QUAN told UC1 he had good news as QUAN was going to make LEVINE aware of the increase in price and attempt to convince LEVINE to travel to Colorado to make the deal.  QUAN said the older man would now be driving out to Colorado and LEVINE would be flying to Colorado.  QUAN stated this after he had previously stated in earlier conversations that driving for the older man was limited to four or five hours.  Additionally, according to QUAN, the older man would drive by himself while LEVINE traveled by airplane.

40.     On February 14, 2014, QUAN left a voice mail for UC1 asking him to return his call. On the same date, UC1 called QUAN on his cell phone.  UC1 recorded the telephone call.  The following details were discussed between UC1 and QUAN: UC1 advised meeting in Colorado was not going to work as the only dates available were during the week of March 17, 2014.  UC1 told QUAN he had concerns with the older man driving the distance in the winter time considering in previous conversations, QUAN had said that travel by vehicle would be at a minimum.  QUAN said he had the same concerns about the older man, but believed LEVINE just wanted to get the deal done before the older man departed for Thailand.  QUAN said the older man is leaving in a week or

13

1  two.  QUAN said he believed the reason no one wanted to travel to Las Vegas on the first occasion

2  was because everyone was being selfish.  QUAN said he found out the older man lives in San

3  Francisco. QUAN said,

4  
> It is what it is, these things exist, ya know, we're not, we're not, we're not selling
> drugs, I don't, I don't condone people ya know, uh, you know, you have a certificate
> you have something you want to go, you know, you know, hunt something that's up
5  > to them.  These are old pieces and they exist and the man has to leave, they got to go
> somewhere regardless.

6

7  QUAN said he buys old rhino horns and not new rhino horns referring to raw rhino horn.  QUAN

8  said to be on the safe side, he only deals with the older pieces because it is safer that way.  QUAN

9  said he had suggested that LEVINE tell the older man to hire someone to drive the horns to the

destination and then pay that individual $1,000.00 for doing so.  QUAN said,

10
> If it's meant to happen let it happen ... it's a little taboo, I don't feel that bad, because
> I know I'm not a drug dealer, I don't do this, this is what it is, it's an old piece, so it is
11  > what it is, somebody has to buy um, they're not going under the ground ... if it works
> out it works out and if there is money to be made let it happen and if it's not meant to
12  > be let it go away.  I don't need it ya know, I want people to be stinking happy, ya
> know.

13  QUAN also told UC1 about an intricately carved rhinoceros horn libation cup. QUAN said he did

14  not know if it was black or white rhinoceros. QUAN said the horn is approximately 20" long and is

15  mounted on an ebony base.  QUAN asked UC1 if he had a buyer for it.  QUAN said he would send

16  photographic images of the libation cup to UC1's computer.  QUAN said if libation cups, like the

17  one described, make it to Asia, China or Hong Kong, they can sell for two to five hundred thousand

18  dollars.  QUAN said he had a friend who is interested in Asian antiques.  QUAN said if UC1 was

19  interested, he would like to start a new business relationship.  QUAN said he had sold a pair of rhino

20  horns to FELIX KHA.  QUAN said he held onto the horns for two or three years and when he sold

21  the horns to KHA he tripled his money.  QUAN asked UC1 to email him the dates and location for

22  March 2014.

23

14

41.     On February 14, 2014, QUAN sent an e-mail to UC1 from the e-mail account "mr4slump@yahoo.com" with the subject "Larry.. Chinese Antique Carved Horns" that stated, in part:

> "... confidential... this is the piece that I was talking about... would fetch big bucks in hong kong christies or sothebys...maybe we can find a buyer... we have about a week to decided on this piece..."

QUAN attached to the e-mail to UC1 ten photos of what appeared to be a rhinoceros horn libation cup.

42.     On February 19, 2014, UC1 received a voice mail message from QUAN's cell phone. QUAN said he confirmed the March dates were "good to go."

43.     On February 19, 2014, QUAN called UC1 using his cell phone.  UC1 recorded the telephone call.  The following details were discussed between UC1 and QUAN: QUAN said his cousin will be driving the rhinoceros horns to Las Vegas and is committed on the 18th and 19th. QUAN said he and LEVINE would be flying to Las Vegas.  QUAN said either QUAN and LEVINE, or just LEVINE would be present for the rhino horn deal as QUAN believed the older man would be leaving the country next week.  QUAN told UC1 that when the call ended, he was going to call LEVINE.  QUAN said if there were any changes in the schedule he would contact UC1 immediately.  QUAN said, "Otherwise, this thing is just written in blood if you don't hear from me."

44.     On February 19, 2014, QUAN sent UC1 an e-mail from the e-mail account "mr4slump@yahoo.com" with the subject "Phone Call."  In the e-mail, QUAN stated that LEVINE has convinced the owner of the rhinoceros horns to postpone his trip until after March 19, 2014, so the owner can be present [for the sale].  QUAN said the older man is driving the rhinoceros horns directly to the meeting location (Las Vegas).  QUAN said he and LEVINE would be taking an airplane and flying to the meeting location in Las Vegas.

**Undercover Communications with EDWARD LEVINE**

45.     On March 6, 2014, QUAN sent a text message to UC1 containing the contact information for LEVINE, including a cell phone number, (XXX) XXX-6966. On March 13, 2014, UC1 placed a recorded telephone call to LEVINE using the cell phone number provided by QUAN, (XXX) XXX-6966. UC1 asked LEVINE whether LEVINE would be in Las Vegas for the sale of the rhinoceros horns. LEVINE confirmed to UC1 that he would be in Las Vegas but that he may not be in the room where the sale will take place. LEVINE also told UC1 that he had listened in on some of the conversations between UC1 and QUAN regarding the sale of black rhinoceros horns to UC1 and that LEVINE is "the man that is directing [the sale]." LEVINE told UC1, "I hope you're comfortable with the arrangements I set-up at this time … you should be …" LEVINE also told UC1 that the sale of the black rhinoceros horns should take place at QUAN's hotel room "somewhere around 5 o'clock" on March 19, 2014.

**Sale of Black Rhinoceros Horns to UC1**

46.     On March 19, 2014, law enforcement agents witnessed QUAN arriving at the McCarran International Airport in Las Vegas, Nevada. QUAN and UC1 spoke by telephone multiple times and arranged to meet at approximately 6:30 p.m at the Southpoint Hotel, 9777 Las Vegas Blvd. South in Las Vegas, Nevada. At approximately 6:30 p.m., QUAN and LEVINE arrived together at the hotel. QUAN met UC1 in front of the hotel and the two proceeded to a hotel room, while LEVINE waited in the parking lot. All of QUAN and UC1's actions in the hotel room were recorded by four video recording and audio recording devices in the hotel room, previously set up by law enforcement agents in anticipation of the sale. QUAN was carrying a soft-sided, silver-toned suitcase and a soft-sided black briefcase. Upon entering the hotel room, QUAN placed the briefcase on a bed and said, "that's for the money." QUAN and UC1 sat at a table in the room and discussed art and other topics, including that QUAN had previously sold a set of black rhino horns to [CS1], had sold another set of black rhinoceros horns to a friend in California for $12,000, and sold another

16

1    set to Felix Kha. QUAN then unzipped the silver suitcase and removed a set of two horns that

2    QUAN purported to be from a black rhinoceros. QUAN set the horns on the floor of the hotel room.

3    UC1 assisted QUAN in removing a blanket that was covering the set of horns. QUAN and UC1

4    looked at the set of horns together and QUAN asked UC1, "are you pleased with it?" QUAN

5    explained to UC1 that the set of horns had been driven to Las Vegas from California by his cousin

6    and the owner of the horns. After further idle conversation, UC1 opened a safe in the hotel room

7    and removed a brown, soft cloth sack, containing $55,000 in cash. UC1 handed the sack to QUAN.

8    QUAN told UC1 that he had promised LEVINE that he would count the money before he left the

9    hotel room. UC1 witnessed QUAN count the money and replace the money back into the soft cloth

10   sack. QUAN put the soft sack into the briefcase, then placed the soft case and briefcase into the

11   suitcase. QUAN and UC1 then discussed other, unrelated sales of artwork and offered to continue

12   looking for more black rhinoceros to sell to UC1. QUAN left the set of two rhinoceros horns with

13   UC1 and attempted to depart the hotel room with the suitcase containing the $55,000, when he was

     arrested by federal agents.

14          47.     On March 19, 2014, QUAN consented to an interview by federal law enforcement

15   agents. QUAN explained to agents that he had met LEVINE approximately six or seven months

16   prior and that LEVINE asked QUAN to assist him in selling the set of black rhinoceros horns for a

17   friend. QUAN explained to the agents that he knew it was illegal to transport and sell black

18   rhinoceros horns interstate because, to his knowledge, all rhinoceros are illegal. According to

19   QUAN, while he was the primary contact with [UC1], he worked at the direction of LEVINE.

20   LEVINE instructed QUAN what to say to [UC1] during phone calls and what to write to [UC1] in e-

21   mails. According to QUAN, he and LEVINE were each going to receive "$5,000 or $6,000, after

     expenses" for the sale of the black rhinoceros horns, on behalf of the owner.

22

23

## VII. CONCLUSION

48.    Based on the foregoing, your Complainant believes that there is probable cause to charge LUMSDEN W. QUAN and EDWARD N. LEVINE with violations of (1) Title 18, United States Code, Section 371 (Conspiracy to violate the Lacey Act and the Endangered Species Act); (2) Title 16, United States Code, Sections 3372(a)(1), 3373(d)(1)(B), 1538(a)(1)(E), 1538(a)(1)(F), 1540(b) (knowing transportation, sale, receipt, acquisition, or purchase of endangered species with a market value in excess of $350 with knowledge that the endangered species were delivered, sold, carried, transported, or shipped in the course of commercial activity and/or were sold or offered for sale in interstate commerce); and (3) Title 16, United States Code, Sections 1538(a)(1)(E) and (F), 1540(b) (interstate transportation and sale of an endangered species in the course of a commercial activity).

Date: March 20, 2014

Special Agent Vance Jurgens
U.S. Fish and Wildlife Service

SUBSCRIBED and SWORN to before me

This _20th_ day of March, 2014

UNITED STATES MAGISTRATE JUDGE

18